**HERSCHBERGER** et al. v. **WOODROW-PARKER CO.** et al.

(Circuit Court of Appeals, Sixth Circuit. October 4, 1921.)

No. 3486.

1. **Exchange of property** &#9756;8(4)—**Misrepresentation as to quality of land not shown.**

In a proceeding to set aside an exchange of farm lands, burden of showing active misrepresentations as to quality of a certain part of the land *held* not sustained.

2. **Exchange of property** &#9756;8(4)—**Misrepresentations as to boundary not shown.**

In an action to set aside an exchange of lands, plaintiff *held* not to have sustained the burden cast upon him of showing misrepresentations as to the location of the boundary.

3. **Exchange of property** &#9756;3(1)—**Fiduciary relationship held to exist between plaintiff and agent for defendants.**

In an action to set aside an exchange of land, *held*, that there was a fiduciary relation between plaintiff and one representing defendants, which entitled plaintiff to know the nature and extent of the employment of the agent by defendant.

4. **Receivers** &#9756;96—**Acts and knowledge of agent of receiver imputable to receiver.**

Acts and knowledge of an agent appointed by receiver to carry out an exchange of lands are imputable to the receiver.

5. **Exchange of property** &#9756;3(1)—**Misrepresentation as to classification of soil held established.**

In an action to set aside an exchange of lands, wherein defendant's agent represented that there were 400 acres of plow land, when in fact there were less than 300 acres, *held*, that there was substantial misrepresentation of the quality and classification of the soil, warranting a rescission, though plaintiff went on the land.

6. **Exchange of property** &#9756;3(1)—**Plaintiff had right to rely on statement of defendant as to acreage of plow land.**

One exchanging land with another through an agent of the latter had the right to assume that such agent knew the farm's acreage in certain qualities of land, and had the right to rely on a statement as to the number of acres that could be plowed.

7. **Vendor and purchaser** &#9756;37(5)—**Knowledge of falsity of statement of fact immaterial.**

Material misrepresentations, though without knowledge of their falsity on the part of the vendor, if relied on by the vendee, give right of rescission in equity.

---

&#9756;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Northern District of Ohio; John M. Killits, Judge.

In the matter of the receivership of the Woodrow-Parker Company. Intervening petition by Amos S. Herschberger, by next friends, against the Woodrow-Parker Company and others, to set aside an exchange of farms and certain conveyances. Decree for defendants, and petitioners appeal. Reversed, with directions.

C. A. Seiders, of Toledo, Ohio, and James W. Mackey, of Marshall, Mich. (Charles A. Seiders, of Toledo, Ohio, James W. Mackey, of Marshall, Mich., and Don C. Corbett, of Clarion, Pa., on the brief), for appellants.

Frank M. Cobourn and Harold W. Fraser, both of Toledo, Ohio (Marshall & Fraser, Tracy, Chapman & Welles, Harold W. Fraser, Charles F. Chapman, and Frank M. Cobourn, all of Toledo, Ohio, on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. This appeal grows out of this situation: Herschberger owned and operated a farm of about 245 acres in Maumee township, Allen county, Ind. (about 1½ miles from Antwerp, Ohio), upon which he resided. The Woodrow-Parker Company owned a farm, known as "Crystal Farm," located near Marshall, Mich. This company was under receivership; defendant Rothfuss, who lived at Toledo, Ohio, being the receiver, under appointment by the United States District Court below. Ewing, who lived at Antwerp, sought to interest Herschberger in an exchange of his farm for some cheap land in Northern Michigan, of which Ewing had the sale, and had arranged to take Herschberger to see this land. Albert Hirzel, a real estate agent at Antwerp, learning of this, proposed to Ewing that he interest Herschberger in the purchase of the Crystal farm, which was included in the list of the Woodrow-Parker Company lands given Hirzel as for sale. Hirzel telephoned the receiver, and learned that the Crystal farm could be had for about $45,000. Hirzel and Jacob Buerkle wished to acquire the Herschberger farm through a trade for the Crystal farm. They agreed to pay Ewing a commission of $2,000 if he made a deal. The Crystal farm was to be priced to Herschberger at $61,000. It was understood that the latter wanted $49,000 for his farm. Just before or during the trip to Michigan, Ewing told Herschberger of the Crystal farm and suggested looking it over. They arrived at the farm late in the afternoon of February 6th, and spent a little time there, just how much is in dispute. On the evening of that day, or on the morning of the next, Herschberger signed a memorandum, prepared by Ewing, agreeing to pay $15,000 difference on a trade of the two farms. On the 7th Ewing wired Hirzel, according to previous arrangement, to come. Hirzel, by telephone, arranged with Dameron, who was the agent at Bryan, Ohio, for the Woodrow-Parker farms, to accompany him to Michigan; Rothfuss having so requested, telling Dameron that the price of the Crystal farm would be $45,000. There was some talk between Ewing, Hirzel, Dameron, and Hersch-

berger on the evening of the 7th, and on the 8th the four were all at the Crystal farm and looked it over. The extent of Herschberger's personal examination is in dispute.

Before Hirzel and Dameron arrived, Ewing and Herschberger had inquired of neighbors regarding the farm. All spoke well of it. How many were thus applied to is in dispute. The result was that on the 8th of February the receiver, through Dameron, agreed in writing with Herschberger, subject to the approval of the court, to convey to Herschberger the Crystal farm at a price of $61,000, and to take as part payment the Indiana farm at $49,000, the $12,000 difference to be secured by mortgage on the Crystal farm. On the same day Rothfuss, through Dameron, agreed in writing with Buerkle and Hirzel to convey to them Herschberger's Indiana farm at $33,000, and to carry $10,000 of the purchase price by way of a mortgage on the Indiana farm, subject to one for $20,000 to be given by Hirzel and Buerkle. One week later the District Court approved the sale of the Crystal farm at $45,000, including part cash, a second mortgage upon the Indiana farm of $10,000, and a first mortgage upon the Crystal farm; the application for the order asserting an opportunity of selling the Crystal farm at $45,000, and that the offer involved "the trading of a farm in Indiana consisting of 245 acres, which the receiver has arranged to sell, and upon the making of the trade the receiver would be paid" the cash and securities just mentioned. Three days later the receiver and Herschberger made an escrow agreement for the deposit in a bank at Antwerp of the receiver's deed for the Crystal farm, Herschberger's deed of the Indiana farm to "the party of the first part, or to whomsoever he shall designate,", and his mortgage of $12,-000 to the receiver on the Crystal farm. Herschberger also agreed to deposit in the bank $2,000 to guarantee the performance of his contract of February 8th; the deeds and securities to be exchanged when proper abstracts of title were furnished. The deed to the Indiana farm, as made by Herschberger, ran to the wife of Albert Hirzel, his brother Stephen, and Buerkle.

On February 27th the Woodrow-Parker Company conveyed the Crystal farm to Herschberger, and on March 5th the latter executed and delivered his $12,000 mortgage to Rothfuss. Soon after, Herschberger's deed to the Indiana farm was delivered and possession of the farm offered. March 10th Herschberger went to Michigan, intending to take possession of the Crystal farm. Before doing so he learned for the first time that the receiver obtained but $45,000 for the Crystal farm, and that Hirzel and his associates had paid but $33,000 for the Indiana farm. He also learned then, or on that trip to Michigan, that Ewing had a $2,000 commission contract. He thereupon attempted to repudiate the sale, and has never taken possession of the Crystal farm, nor recorded his deed thereto. The following May Herschberger was, on his wife's application, adjudged by the probate court for Calhoun county, Mich., to be mentally incompetent, and the wife and appellant Kilpatrick were appointed guardians. On May 17th the court below appointed the two guardians as next friends, and granted leave to file an intervening petition for relief respecting the trans-

action. A petition was filed, asking that the exchange of farms and the conveyances and securities connected therewith be canceled and set aside, as in fraud of Herschberger's rights, and for general relief. Upon hearing on pleadings and proofs, the intervening petition was dismissed, the receiver given judgment for specific performance, his title to the $12,000 mortgage upon the Crystal farm held valid, Herschberger ordered to record his deed thereto, and the receiver's title quieted. This appeal is from that final decree.

The grounds relied upon for relief are (1) alleged misrepresentation and concealment of the character of the lands near the western boundary of the farm; (2) the location of the southern boundary; (3) misrepresentation as to the acreage of the crops, the nature and tillability of the soil, and the value of the farm; and (4) the methods alleged to have been used by defendants in bringing about the trade, including an asserted collusive arrangement between Hirzel and Dameron and Ewing, and other means charged to have been employed for unduly influencing and misleading Herschberger.

The District Judge was of opinion that there was no clear and convincing showing of fraud or imposition with respect either to the boundaries of the farm, its acreage or the quality of the soil; that both boundaries were clearly pointed out to Herschberger, and full opportunity given to examine the entire farm; and that the asserted false representations were not made by the receiver. The trial judge was also of opinion that the Michigan farm was worth substantially more than the Indiana farm, but that the amount of such excess in value was merely speculative. While regretting that the complete transaction which was to result in the conveyance of the farm by the receiver was not brought to the court's attention, yet the court felt that it had known fairly well the general nature of the transaction, to the extent that a triangular trade was involved, and that the Indiana farm was to be disposed of as part of the purchase price of $45,000 for the Crystal farm, and that the court had thus not been imposed upon in the transaction. The judge was further of opinion that there was no showing that Herschberger was mentally weak or unable to protect himself, that he knew Ewing was to receive a commission for the sale, and so was put upon his guard, and that there was no satisfactory showing that he had been overreached.

[1] The significance of the alleged misrepresentation as to the quality of the land near the western boundary lies in the fact that this westerly strip consists of about 24 acres of rough, stony upland, not suitable for cultivation, but available only for pasture, and that adjoining it to the east is a tract of marsh land, containing about 77 acres, equally unavailable for cultivation. That part of the farm was about four-fifths of a mile wide, east and west. Herschberger's claim is that he was not taken where he could have a good view of this part of the farm; that there was but a mere pretense of showing that western part of the farm; counsel say, "Just enough said to lead him to believe that all the way over the ground was similar to that on which they then were," which was the best part of the farm. It is undisputed that Herschberger had opportunity to learn the character of

these two parcels. There is evidence tending to show that he was in sight of the marsh land at least, and that he could have seen the rough, stony land to the extreme west. The burden of showing active misrepresentation as to the quality of this western boundary land is not sustained.

[2] The matter of the southern boundary is more complex. The farm was about 1½ miles in its greatest length north and south. There was a highway along the western boundary of so much of the farm as is involved in what has already been said. There was also a highway extending in a generally north and south direction through the entire farm, which was made up of several original farms, and had three sets of farm buildings adjoining this highway. The alleged misrepresentation as to the southern boundary is that Herschberger was told by Dameron that that boundary was a certain east and west road, below which there was in fact a tract of 105 acres, known as the Harrington farm, the greater part of which was marsh. Herschberger was advised that the three sets of buildings belonging to the farm were all painted blue, and if a certain windowless blue house was understood to belong to the Crystal farm there is no basis for the charge of misrepresentation. There was, however, adjoining the east and west road, and just north of the Harrington farm, a piece of about 2 acres belonging to one Lee; the house being painted white. If this house belonged to the Crystal farm, the three houses were accounted for. Herschberger asserts that he was told by Dameron that this Lee house belonged to the Crystal farm. Dameron and Hirzel both deny this allegation.

Ewing, when first a witness, testified that Herschberger asked that question, and that Dameron did not then reply to it; that Ewing had himself once thought that the east and west road referred to was the southern line, and was confused about it until shortly before the written contracts were made, when, as he testified, Dameron stated the true situation. Later in the trial it was shown that of his own motion Ewing had since his former testimony given plaintiff a written statement to the effect that, when the contract was being prepared, Herschberger asked Dameron several times if the blue house with the windows out was on the Crystal farm, and was told that it was not, and that neither himself nor Herschberger knew, prior to the signing of the contract, that the so-called Harrington farm was part of the Crystal farm, and that his first knowledge to that effect was after he returned with Herschberger in March to take possession of the Crystal farm. Upon re-examination Ewing qualified that in some respects, disputed the accuracy of the written dictation, and on the whole left his testimony in a most confused and unsatisfactory condition.

We do not think Herschberger has sustained the burden of showing actual misrepresentation of the location of the southern boundary; but we are convinced, from a consideration of all the testimony, that Herschberger did not understand when he signed the contract, nor indeed until his return in March, that the so-called Harrington farm was part of the Crystal farm, and that, had he known it, he probably would not have made the trade. The boundaries had been traced out on a map shown him, but that probably did not mean much to him. This

brings us to the question of the methods used to induce Herschberger to make the trade.

[3, 4] We are satisfied that Herschberger had originally no desire to dispose of his Indiana farm. It was a grain farm and unincumbered, and he apparently a successful farmer. The suggestion of looking at Michigan cheap lands came from Ewing, as did also the later suggestion of seeing the Crystal farm. We agree with the District Judge that Herschberger is not shown to have been weak-minded. He appears to have been a good judge of lands of the kind he was in the habit of working, but without real experience in stock farming, or with such lands as the Crystal farm is largely composed of. He had little education, had not gone beyond the third grade in school, wrote but little, and read slowly, and not easily. He was in the habit of relying greatly upon Ewing's advice and assistance, having employed him to straighten out some personal difficulties which apparently had worried Herschberger. Ewing evidently had great influence over Herschberger. Defendants had the right to employ Ewing to help bring about the trade, and the latter had the right to accept such employment; but in view of the relations between the two, Herschberger was entitled to know the nature and extent of that employment. Previous to the closing of the trade his only information was the statement by Ewing that the latter was to get a commission of $100, and if the trade went through he should divide that with Herschberger. This statement did not merely neutralize the effect of knowledge of the existence of a commission; it would naturally induce a belief that Ewing was still trying to make the best bargain he could for Herschberger, and throughout the negotiations Ewing seems outwardly to have assumed that attitude.

Before the arrival of Dameron and Hirzel, he procured Herschberger's signature to the $15,000 boot agreement, even before the Crystal farm had been thoroughly examined. He wired for Hirzel to come. He was with Herschberger almost constantly until the deal was perfected, even accompanying him to an evening meeting of the members of the church to which Herschberger belonged, known as "The Saints," and to which organization Ewing did not belong. After the return to Indiana, Ewing assisted or advised Herschberger in disposing of his personal property and helped him to drive his cattle to Michigan. He had also arranged to help Herschberger conduct the stock farm. These relations indicate an apparently fiduciary relation between the two. It is undisputed that it was not until the return journey to Michigan, to take possession of the Crystal farm, that Herschberger was informed of the amount of commission Ewing was to receive. Dameron, who represented the receiver, knew before he reached Michigan that Hirzel was to pay Ewing $2,000 commission, and at Marshall Ewing tried to get Dameron to sign the commission agreement. Dameron knew that Hirzel and Buerkle were to take the Indiana farm, and that what they paid for that farm would depend on what was obtained for the Michigan farm. The more boot Herschberger paid, the lower the purchase price to Hirzel and Buerkle. During the active negotiations in Michigan, Dameron and Hirzel conferred

275 F.—58

together from time to time as offers were made, and in the absence of Ewing and Herschberger. Each time an offer was made and refused, Ewing and Herschberger left the room and conferred together, while Hirzel stayed in the room with Dameron. The latter admits this; also that he suspended a conversation with Herschberger while he went to the other side of the room and talked with Ewing about the signing of the commission agreement.

There were thus in appearance two opposing camps. In reality Ewing was working for Hirzel to influence Herschberger. The record is convincing (we do not attempt to detail all the testimony) that Dameron must have known this, as well as the facts that Ewing had great influence over Herschberger, that the latter was relying greatly on Ewing's advice, and that Herschberger was ignorant of the actual commission agreement, and believed Ewing to be acting as his friend. We are also convinced that Dameron, representing the receiver, took the benefit of that relation and situation, and to that extent may fairly be said to have colluded with Hirzel and Ewing in bringing about the result reached. Dameron's acts and knowledge, of course, are imputable to the receiver. These considerations, however, are valueless, unless Herschberger was overreached in the transaction, and unless they assisted in that result. But we think he was overreached, and that that result was to a substantial extent brought about by the collusive arrangement and understanding referred to.

Without resorting to speculation, we are impressed that the Crystal Farm was worth much less than $12,000 in excess of the value of the Indiana farm. While it had once been sold by the Woodrow-Parker Company for much more than $45,000, it had been taken back on foreclosure of the purchase-money mortgage; and while there was testimony placing its value as high as $61,000, and perhaps more, the estimates given by two experienced real estate dealers (witnesses for defendants) were from $45,000 to $48,000. The receiver had offered it at $42,000 to the tenant who was occupying the land when the trade was made. The tenant would have bought, if he could have made suitable financial arrangements. On the other hand, 12 apparently qualified witnesses, mostly farmers and including two supervisors, produced by plaintiff, gave values ranging from $30,000 to $50,000; those of the supervisors being $33,000 and $35,000, respectively. The receiver was anxious to sell at $45,000, and the court, after careful hearing, in which one of the parties interested in the Woodrow-Parker Company contended that the farm should sell for more than that amount, decided that a sale at that price was for the best interests of the estate. Making allowances for the difficulty in obtaining full value for receivership properties, we think that $45,000 to $50,000 was all that the farm is reasonably shown to have been worth in the market.

[5] As to the Indiana farm: Herschberger had purchased it in 1912 for $26,500, and had put on $3,000 of improvements. It plainly appears that during several years before 1919 farming lands in that part of Indiana had greatly advanced in value. Plaintiff asked $200 an acre, or $49,000. Several people acquainted with the farm placed

its value at that sum. Ewing says it was worth $180 to $200 an acre. On the other hand, several witnesses for defendants placed valuations ranging from $140 to $160 an acre. The valuations of Dameron, Buerkle, and the two Hirzels ranged from $125 to $150 per acre. Defendants' counsel concede in their brief that the Indiana farm was probably worth at the time of the trade "somewhere between $35,000 and $40,000." We are disposed to think that it was as well worth $40,000 as was the Crystal farm worth $45,000. Indeed, the receiver's application for approval of the sale of the Crystal farm at $45,000 stated (as affecting the value of the proposed second mortgage on the Indiana farm) the information and belief that "the Indiana farm is worth approximately $40,000." We have no doubt that, had Herschberger known that Hirzel and Buerkle were getting his farm for $33,000, and that the receiver was thus obtaining but $45,000 for the Michigan farm, the trade would never have taken place.

The question presented here is not merely one of market value; it involves the actual quality of the lands in the Crystal farm, as reflected in market value. The farm was valuable as a stock farm. In our opinion, however, the evidence shows a material overstatement by Dameron as to the nature and classification of the soil, tending to induce the trade and to Herschberger's prejudice. Herschberger says that Dameron stated that there were 400 acres of good plow land, and that the remaining was pasture land, about 80 acres of marsh. Ewing's version of Dameron's statement is 400 acres of farming land, and the remainder pasture. Dameron admits making the statement that there were 400 acres of plow land and approximately 200 acres of pasture land, probably 225.

We are impressed by the testimony of plaintiff's engineer and surveyor, whose careful examination, survey, and plat, made in July, 1919, showed about 227 acres covered by buildings and yards, highways, lanes, crops, meadow, and stubble; about 98 acres of upland pasture, "being land that is grown up in June grass principally" (a part only being tillable, because in small pieces and some of it stony and rough); about 72 acres of meadow pasture, "that is, pasture on land that is now used for pasture that had formerly been in tame hay"; about 216 acres of marsh (raising only marsh grass and not tillable), and about 4.6 acres of lake and pond. In his opinion there were about 282 acres of good, tillable land. He estimates the "tillable" land at 312 acres. Conley, the tenant, who had known the land many years, says that "280 acres is all that you can call plow land." While the 216 acres of marsh land was of value to a stock farm and was pasturable, except during very wet periods, we are impressed by Conley's testimony that cattle will not fatten on marsh grass. We think there was a substantial misrepresentation of the quality and classification of the soil.[1]

---

[1] Misrepresentations as to the existing acreage of wheat and rye are asserted. The conflict is too great, and the effect too unimportant, in view of the conclusions we have reached, to justify determining where the truth lies.

[6, 7] Assuming, for the purposes, at least, of this opinion, that Dameron believed his representation to be true, we think that, as between the receiver and Herschberger, the former was presumed to know, and Herschberger had the right to assume that he knew, the farm's acreage and soil to the extent just discussed, and that, especially in view of all the circumstances and conditions attending the transaction, Herschberger was not bound to test out the correctness of such representations, which were of fact and not of opinion. In the courts of equity, both state (generally) and federal, material misrepresentations, though without knowledge of their falsity on the part of the vendor, if relied upon by the vendee (as the representations in question doubtless were) give right of rescission. Joslyn v. Cadillac Automobile Co. (C. C. A. 6) 177 Fed. 863, 867, 101 C. C. A. 77, et seq., where the distinction between the rules in law and equity is stated and numerous decisions of both state and federal courts are cited, including McFerran v. Taylor, 3 Cranch, 270, 281, 282, 2 L. Ed. 436; Smith v. Richards, 13 Pet. 26, 36 et seq., 10 L. Ed. 42; Kell v. Trenchard (C. C. A. 4) 142 Fed. 16, 23, 73 C. C. A. 202. We would not be justified in extending this opinion by discussing the numerous other matters presented by the respective sides as affecting the merits. We have, however, considered them all. In our opinion, Herschberger is entitled to a rescission of the trade.

It results from these views that the decree below should be reversed, and a new decree entered, setting aside the exchange. The many matters of detail respecting incumbrances and the protection of the rights of all parties involved will be committed to the District Judge.