**LULI CORPORATION, a New York Corporation, et al., Appellants,**

v.

**EL CHICO RANCH, INC., a Missouri Corporation, et al., Respondents.**

**No. 55679.**

Supreme Court of Missouri,
Division No. 1.

May 8, 1972.

Opinion Modified on Court's Own Motion
June 12, 1972.

Motion for Rehearing or to Transfer to Court
En Banc Denied June 12, 1972.

Husch, Eppenberger, Donohue, Elson & Cornfeld, Carroll J. Donohue, John A. Rava, Francis M. Oates, St. Louis, for plaintiffs-appellants.

Hendren & Andrae, by Henry Andrae, Jefferson City, for respondents-defendants.

HIGGINS, Commissioner.

Action for rescission of plaintiffs' purchase of El Chico Ranch from defendant El Chico Ranch, Inc., for $196,500, on grounds of fraudulent misrepresentations alleged to have been made by defendants John K. and Jacqueline Teaford. If plaintiffs prevail, defendants would be required to reimburse plaintiffs more than $116,000 and title to the real estate in question would be transferred from plaintiffs back to defendants. Temporary injunctions were granted restraining defendant El Chico from negotiating plaintiffs' $80,000 purchase money note and restraining defendants Teaford and defendant Kay from foreclosing the deed of trust securing the note. After more than eleven days of trial between May 26, 1969, and October 31, 1969, recorded in a 1979-page transcript, the court, on April 14, 1970, entered findings of fact and conclusions of law, and judgment for defendants; and, on April 16, 1970, the court entered amended findings of fact and conclusions of law and judgment for defendants which included dissolution of the temporary restraining orders. On application of plaintiffs, both temporary restraining orders were reinstated pending determination of this appeal which, of course, evokes a review of the case in the manner prescribed by Rule 73.01(d), V.A.M.R. Allmon v. Gatschet, Mo., 437 S.W.2d 70, 73 [3]; Nixon v. Franklin, Mo., 289 S.W.2d 82, 88 [5]; Cannon v. Bingham, Mo.App., 354 S.W.2d 894, 900 [2].

The case was tried on plaintiffs' second amended petition which alleged that prior to plaintiffs' purchase of El Chico Ranch, defendants, either knowing of their falsity or without knowledge of their truth or falsity, made false representations: that El Chico contained 465 acres of rich soil bottom land, all tillable and now in lush, improved pastures; that same were sufficient to graze and fatten 400 mature cattle annually; that the real property was ca-

pable of producing an annual gross income of $61,380; that El Chico had 13 ponds; that 15 miles of new fence had been erected; that El Chico and Teafords had invested more than $250,000 in the real and personal property of El Chico; that the cattle involved were in good shape and free from disease; that plaintiffs were induced by said false representations to purchase El Chico Ranch and to give their promissory note and deed of trust as part of the purchase price. Plaintiffs tendered conveyance and possession of the ranch and personal property in exchange for the return of cash, note, and deed of trust. Defendants El Chico and Teafords denied the tender, allegations of fraud, and plaintiffs' right to do business in Missouri; and alleged that plaintiffs failed to perform their obligations, that plaintiffs have committed waste, that they do not come into equity with clean hands, and that they failed to exercise ordinary care in their reliance upon defendants' representations.

The evidence supports the findings of the trial court and the same findings are made on this review:

" * * * that plaintiff Luli Corporation, a corporation, is a closely held corporation owned by plaintiffs William Clemente and Mary Lou Clemente, and that defendant El Chico Ranch, Inc., a corporation, is a closely held corporation owned by defendants John Teaford and Jacqueline Teaford, and that plaintiff Luli Corporation purchased from defendant El Chico Ranch, Incorporated, a ranch located in Cole County, Missouri, consisting of 1,358 acres together with cattle, machinery, tools and equipment located on the ranch for the price of $196,000.00 [$196,500], and the agreement to assume a note to the Production Credit Association secured by the cattle on the ranch.

" * * * that in the spring of 1967 defendants listed the El Chico Ranch for sale with the United Farm Agency. A description of the ranch property was prepared and put in a brochure for the United Farm Agency and practically the same

information was placed in the United Farm Agency sales catalog which was distributed nationally. In both the catalog and the separate brochure a statement was made, 'The ranch of 1,358 acres, has 465 rich soil bottom land acres, all tillable and now in lush improved pastures'.

" * * * that in the spring of 1967 Vernon Nau, a representative of the United Farm Agency in Tipton, Missouri, received an inquiry about the ranch from plaintiffs William and Mary Lou Clemente and in response to their request sent a copy of the brochure describing the ranch to the Clementes.

" * * * that in the latter part of May, 1967, plaintiff William Clemente, a New York resident at the time, came to Missouri to look over the El Chico Ranch, and on May 26, 1967, met with Vernon Nau, the United Farm Agency representative, and was taken to the ranch to make a personal inspection. Plaintiff William Clemente, who was accompanied from New York by a man by the name of Marion was taken on a personal inspection of the ranch by defendant John Teaford. That after looking at the property plaintiff William Clemente sent for his wife and for his accountant, one Robert Schulman, and within several days they came to Missouri. After several days of negotiations, which included conferences between the Clementes and the Teafords and an inspection of Teafords' records by the accountant, a contract was prepared and signed on June 2, 1967, which in general provided for the sale by defendants to plaintiffs of the El Chico Ranch, cattle, machinery, tools and equipment for the sum of $206,500.00, and plaintiffs were to assume the obligation of paying off a loan secured by the cattle on the ranch to the Production Credit Association. Said contract called for a completion of the sale on November 10, 1967.

" * * * that in the latter part of August, 1967, plaintiff William Clemente became concerned over the condition of the cattle on the ranch and after further nego- tiations with defendants Teaford a new agreement was entered into between the parties which provided for a total sales price of $196,000.00 [$196,500] and called for a completion date of September 15, 1967. The contract generally provided for the payment of $116,000.00 and for the balance of the purchase price to be represented by a note in the amount of $80,000.00 se- cured by a deed of trust on the real estate and provided further that the plaintiffs were to assume the obligation of the note payable to the Production Credit Associa- tion and secured by the cattle on the ranch.

" * * * that on the same date as the contract plaintiffs executed a note in the amount of $80,000.00 and a deed of trust on the real estate to secure said note and defendants executed a bill of sale for the cattle, machinery, tools and equipment.

" * * * that defendants delivered a deed to the real estate and a bill of sale for the cattle, machinery, tools and equipment on the property and received a payment in cash of $116,000.00 and a note in the sum of $80,000.00 secured by a deed of trust on the property from plaintiffs.

" * * * that thereafter plaintiffs sold the cattle in December of 1967 and Febru- ary, 1968, and applied the entire proceeds of the sales on paying off the note to Pro- duction Credit Association, but after mak- ing such payment said note still has a balance due in excess of $7,000.00, which is due and owing.

" * * * that the statement in the bro- chure and the United Farm Agency catalog that the ranch had 475 [465] acres of im- proved pasture was incorrect, that actually when said land was measured in the late fall of 1967 it was determined that there were only about 200 acres of improved pasture on the ranch.

" * * * that when defendant Clemente first came to examine the ranch and before the contract of sale was executed on June 2, 1967, that defendant John Teaford in- formed plaintiff William Clemente that

even though the ranch was advertised to contain 465 acres of improved pasture that he would not guarantee the acreage in improved pasture, and that the Clementes as purchasers would have to make their own determination as to the amount of improved pasture on the ranch.

" * * * that .defendant John Teaford did not intend for plaintiffs to rely on the statements as to the amount of improved pasture contained in the brochure and catalog of the United Farm Agency.

" * * * that plaintiffs did not have the right to rely on the statements in the brochure and the United Farm Agency catalog as to the amount of improved pasture after receiving the disclaimer of the statements from the defendant John Teaford.

" * * * that the note in the amount of $80,000.00 and the deed of trust securing said note were executed by plaintiffs and that same are valid and binding instruments.

" * * * that said sale was consummated and that same was not procured by fraud and that plaintiffs are not entitled to have said sale annulled, or cancelled, or rescinded, and that it is concluded that defendants are entitled to judgment and that a judgment for defendants should be entered in accordance with the findings hereinabove set out."

The following detailed finding of facts is made to demonstrate support for the trial court's findings, and also to assist in an understanding and disposition of the issues on this appeal.

Plaintiffs Clemente, husband and wife, own all the stock in plaintiff Luli Corporation, a New York corporation. Prior to October, 1967, they resided in Oceanside, New York, where Mr. Clemente was a contractor engaged in heavy construction of water lines and sewers. Mrs. Clemente spent her first eighteen years on a farm, but Mr. Clemente had no prior experience in farming. Mr. Clemente had experienced some health problems and decided to leave New York and the pressures of the construction industry for farming, which he felt to be a good, healthy way of life.

Defendants Teaford, husband and wife, own all the stock in defendant El Chico Ranch, Inc., a Missouri corporation, which, prior to the sale in question, was the record owner of the property. Mr. Teaford had been a partner in an engineering company engaged primarily in building and operating food processing plants in South America and Cuba. He returned to the United States in November or December, 1959, following the Cuban revolution; and, to be near her family, he and Mrs. Teaford went to central Missouri where they bought the three farms totaling 1,358 acres, comprising El Chico Ranch.

In December, 1966, Mr. and Mrs. Teaford listed El Chico Ranch for sale with United Farm Agency, Inc. Mr. Teaford furnished UFA with a statement of information and he and a UFA representative, Vernon Nau, spent a day examining the property. Mr. Teaford completed the UFA listing agreement which contained recitals that El Chico contained 465 acres of tillable acreage, bottom land or pasture, and represented "that no conditions or agreements exist other than those contained" in the listing agreement. Despite this quoted representation, there was conflict in the testimony whether the 465-acre recital was qualified. Mr. Teaford maintained he told Mr. Nau that he was not certain of the 465-acre figure; Mr. Nau denied that Mr. Teaford had ever told him that any of the representations were incorrect. Mr. and Mrs. Teaford bought the three farms comprising El Chico through UFA and the listings of those farms showed a total of 465 acres of improved pasture. Mr. Teaford relied on these listings when he supplied UFA with the 465-acre figure in listing El Chico for sale "for the simple reason that that is exactly the way we bought it from United." He did not use such figure in his own resumé, and, in a prior lease agreement, he had specifically disclaimed knowledge of the extent of acreage leased.

UFA prepared a brochure on El Chico and placed the listing in its nationally distributed catalog. Mr. Teaford learned the 465-acre figure had been used in such materials when he obtained a brochure from the UFA office in Tipton, Missouri.

For some time prior to 1967, Mr. and Mrs. Clemente explored the possibilities of engaging in cattle ranching and grazing. Mrs. Clemente obtained printed materials on the subject, and they envisioned an operation of approximately 500 acres of improved pasture and 200 head of cows. They searched advertisements in the Wall Street Journal and New York Times, and ultimately saw an advertisement of UFA concerning cattle ranches in Missouri. Mrs. Clemente wrote UFA at Tipton for information and received the brochure on El Chico which, among other things, recited: "This extraordinary ranch comprises 1,358 acres, has 465 rich soil bottom land acres, all tillable and now in lush improved pastures * * *. Owner reports regularly fattening up to 400 head of mature cattle. Abundant water supply from 13 ponds, 2 wells * * *. Owners reportedly have invested more than the selling price * *. The lucky new owner gets it all for $250,000 * * *."

After reading the brochure, Mr. and Mrs. Clemente called Mr. Nau April 28, 1967. They questioned him on the brochure and he verified its details, including the recital of 465 acres of improved pasture.

Several weeks later Mr. Clemente called Mr. Nau and made an appointment to see the ranch. He arrived in Missouri the next day, around May 24 or 25, 1967, accompanied by his friend, Robert Marion, a fireman in Paterson, New Jersey. Mr. Marion had been raised on a neighboring farm to Mrs. Clemente, and he had attended agricultural college and appeared to know about farming. He was present during subsequent discussions with Mr. and Mrs. Teaford leading to plaintiffs' purchase of El Chico, but was not called as a witness at trial.

On the morning following the arrival of Mr. Clemente and Mr. Marion, they were met by Mr. Nau who conveyed them to El Chico and introduced them to Mr. and Mrs. Teaford. Preliminary discussion occurred while Mrs. Teaford served coffee and the discussion gave rise to the basic conflict in the testimony. Mr. Clemente claimed that during this conversation Mr. Teaford said: "I have surveyed, I have cross-fenced this ranch in to six different pastures, and I have a total acreage of 465 acres of the most beautiful and improved pasture in Cole County, and I have surveyed every foot of it." Mr. Teaford denied the statement and his testimony on this aspect of the conversation was: "I told him that we did not know how many open areas of pasture there were * * *. I further told him all at the same time that we had never measured any of the farm and that he should make his own determination if he wished to know how many open acres there was, we could not warrant it all. * * * Specifically, I told Mr. Clemente that we had advertised the ranch to contain four hundred sixty-five acres of improved pasture, but I wanted him to know that we had never measured any of the pasture on the ranch or any parts of the ranch and we could not guarantee the measurement of these fields, and furthermore he would have to make his own determination as to the size of the fields. I wanted it clearly understood, and I told him we had also said this to United Farm Agency when they listed it and I told them the right to make such a statement to any clients they brought us." Mr. Teaford made this disclosure at the outset of the meeting because of his discovery of the 465-acre figure in the brochure shortly before this meeting. When asked why he was so careful to tell Mr. Clemente that the acreage figure was not dependable, Mr. Teaford explained: "The why is this, that in my way of doing business, I insist that everybody know all the facts."

Mr. Nau recalled from this conversation that "John went on to explain that he had bought this place in three different

tracts and put it together, and I can't remember the exact words but he said he couldn't warrant what the acres was. \* \* The best I recall was that John says he advertised this thing at 465 acres but we cannot warrant that it is here because I got the information off of these places that I bought, that is where he got his information, and it was not surveyed."

Mrs. Teaford heard her husband's plan for the tour of the farm. "I was cooking lunch at the time they arrived for their tour of the farm, and they would have to really move along, and they would be back at the house for lunch, and they would see the balance of the farm after lunch. He also explained to Mr. Clemente with reference to something he had said previously to Mr. Nau that he wanted him to know that the farm had been advertised at a certain acreage but he could not guarantee that acreage because he had not measured it and he wanted to make sure Mr. Clemente knew that before he saw the property because he would have to see for himself."

Mr. Clemente testified that this conversation also produced Mr. Teaford's assurance that the ranch could carry 200 cows in a cow-calf operation.

Following this conversation, Messrs. Teaford, Nau, Clemente and Marion drove over part of the ranch in Mr. Nau's Jeep. Mr. Clemente noted cattle on the property and stated that Mr. Teaford said he had 365 steers. Mr. Nau observed that they would never catch up to the grass and that it should be mowed for hay. They returned to the house for lunch and, after lunch, drove over other areas of the ranch. Mr. Clemente admitted he was never denied access to anything on the ranch or to any part of the ranch. He claimed he saw only a "few hundred feet" of fence, "maybe 1,000 feet or thereabouts." Mr. Nau described the inspection tour as going "from one end of the ranch to the other," spending some five hours in the process.

After the day's inspection, Mr. Clemente returned to his hotel, El Donna Motel in Eldon, Missouri, and called Mrs. Clemente. She flew to Missouri the following day and Mr. Nau drove them to the ranch that afternoon. A conversation with conflict similar to that of the previous day transpired. The Clementes' version was that the Teafords represented the ranch as containing 465 acres of pasture, surveyed by Mr. Teaford, suitable for 200 head of cattle in a cow-calf operation or for fattening 400 mature cattle, and undergrazed. The Teafords' version denied the acreage representation and reiterated the warning to the Clementes to make their own acreage determination. According to the Clementes, Mr. Teaford also said he had made a plat of all the pastures, and that it was either in the house or thirty miles away at another property on the Lake of the Ozarks. Mr. Clemente claims he asked for a survey two or three times prior to the sale closing on June 2, 1967. Mr. Teaford denied· making the plat and the asserted requests.

This conversation was also productive of a discussion of price, during which Mr. Teaford said he had invested $270,000 in the ranch. After this conversation, Mr. Nau drove Mr. and Mrs. Clemente to the motel where he agreed to give them a cost breakdown and a market value of the property.

Mr. Nau, assisted by Harold McCain, UFA district manager, prepared such material, using a 465-acre pasture figure, and reviewed it with Mr. and Mrs. Clemente at the motel. Mr. Clemente recognized that the document was but an estimate of anticipated returns from the ranch.

On June 2, 1967, another conference transpired at the ranch house and among those present was Robert Schulman, accountant for Mr. and Mrs. Clemente, who had flown from New York at their request. He, too, testified that Mr. Teaford represented the ranch to contain 465 acres which he had measured himself. Mr. Teaford backed his denial of this representation, stating that Mr. Schulman was not projecting profits on a 465-acre and one-steer-per-acre basis, but

was using a 700-steer figure suggested by Mr. Marion. "There was a great deal of discussion * * * about the question of potential profits * * * and Mr. Schulman was using the seven hundred figure which Mr. Marion had estimated that this farm could carry, and I told them they were foolish to try to project any profits on that basis * * * I tried to point out to them that I thought they were taking the wrong track entirely, they were wishfully thinking. * * * I thought they could spend their time much better * * * looking at the farm, and fences, and fields, and Mr. Clemente said we want you to know that we know your land a lot better than you think we do."

Also present at this meeting were Mr. and Mrs. Clemente, Mr. and Mrs. Teaford, James Crews, attorney for Mr. and Mrs. Clemente and personally familiar with El Chico, Mr. McCain, and Mr. Nau. As Mr. Nau described the occasion, Mr. Schulman examined tax returns and cattle invoices, and attributed values to cattle, land, house, and improvements. In conclusion, " * * * he told Mr. Clemente to just forget it, it was a losing proposition." Nevertheless, Mr. and Mrs. Clemente proceeded to offer $175,000 for El Chico; the offer was refused by Mr. and Mrs. Teaford; the conference and negotiations were terminated; the farm was withdrawn from sale; and Mr. and Mrs. Clemente returned to their motel.

Later, in the evening of June 2, 1967, Mr. Teaford, at his wife's request, called Mr. and Mrs. Clemente at El Donna Motel and renewed negotiations, offering to take $206,500 for El Chico. Tentative agreement was reached, and the parties resumed their conference at El Donna Motel with the addition of Harry Kay, attorney for Mr. and Mrs. Teaford. The agreement for the sale of El Chico was reduced to writing by Mr. Crews, attorney for Mr. and Mrs. Clemente. The agreement, represented by Deposit Receipt and Agreement of Sale, was dated and executed June 2, 1967. Sale price was $206,500, with deed to pass September 15, 1967, and possession to pass November 10, 1967. Earnest money of $20,650, was paid, with $50,000 additional to be paid September 15, 1967, and $46,000 to be paid November 10, 1967. The balance was to be paid by payment September 15, 1969, of "$5,0000.00" (sic), seven additional annual payments of $5,000, and the balance ($50,000) due on the next annual payment date. A check for $150 was given the Clementes by Mr. Teaford to even the total price at $206,500. Additional provisions in the agreement covered allocations of the purchase price to land, equipment, buildings, fence, house, tools, for benefit of the purchasers, and for purchase of sellers' cattle which sellers agreed to care for until September 15, 1967. The contract carried the number 1501, which referred to the descriptive listing in the UFA brochure. Dispute ultimately arose over construction of the provision for the final or "balloon" payment of the note. Mr. and Mrs. Clemente maintained there was no "balloon" provision, saying the figure "$5,0000.00," payable September 15, 1969, should have been $50,000 and, therefore, the final payment would have been less than the previous annual payments of $5,000 each. However, Mr. Crews, attorney for Mr. and Mrs. Clemente and scrivener of the instrument, testified that the payment of September 15, 1969, was to be $5,000 which he inserted as "$5,0000.00" in the contract. In his words, "This thing has an extra zero in it." This interpretation was confirmed by Mr. Kay.

After completion of the contract, Mr. and Mrs. Clemente returned to New York. In late August, 1967, Mr. Clemente returned to the ranch and was disturbed about the appearance of the cattle. The cattle had gained up to 200 pounds in weight and did appear different from their condition in June. In any event, he secured renegotiation of the sale for the final price of $196,500. Mr. Teaford agreed to reduce the price "providing you close the deal right now." Accordingly, on August 29, 1967, Mr. and Mrs. Clemente, Mr. and Mrs. Teaford, Mr. Crews, Mr. Kay, and Mr.

Nau met at Mr. Kay's office in Eldon to draft documents and close the sale anew.

The parties agreed upon and executed a Contract and Escrow Agreement which recited the prior agreement of June 2, 1967, the current disagreement over condition of cattle, and the parties' desire "to resolve and settle all disagreements regarding said transactions and to close same prior to the dates set out in said contract." The parties then agreed, among other things: that El Chico Ranch, Inc., would execute a warranty deed to the real estate and a bill of sale to all personal property, same to be placed in escrow with the Bank of Eldon; that Luli Corporation execute its promissory note for $80,000, payable in six annual installments of $5,000 beginning September 15, 1969, with a final payment of $50,000, together with interest payable semiannually, with first payment due March 15, 1968; that Luli shall deposit $96,000 [1] (the $50,000 and $46,000 payments from the June 2, 1967, contract) for subsequent disbursement to El Chico; that Luli shall procure release of an obligation owing Production Credit Association by Teafords; that Luli shall pay El Chico $1,550 for care of the cattle during the period between June 2 and August 29, 1967; that possession of all real and personal property be delivered prior to September 15, 1967; that Luli "accepts all personal property and the real estate in the condition they are now in and neither (El Chico) nor the said John K. Teaford and Jacqueline Teaford shall be liable for any claims arising out of this transaction other than the obligation of the Warranty Deed and Bill of Sale."

Also on August 29, 1967, Luli Corporation, by Mr. and Mrs. Clemente, executed its deed of trust on subject real property to secure Luli's note for $80,000 as described in the Contract and Escrow Agreement. It is this note and deed of trust that the beneficiaries and trustee have been enjoined from collecting and foreclosing pending determination of this litigation.

The second major dispute is Clemente's claim in connection with this note that there was no "balloon" provision intended and that the first interest payment was not due until March 15, 1969. They claim also that they did not know of the March 15, 1968, interest provision until the property was up for foreclosure. To support this claim, they produced a purported conformed copy of a note showing the first interest payment to be due March 15, 1969. However, all other witnesses recall the intention to provide for the "balloon" note and a first interest due date of March 15, 1968, and this version is corroborated by the Contract and Escrow Agreement. Mr. and Mrs. Clemente suggest a switching of pages in the three pages of the agreement, but they used the identical agreement as the agreement in force in connection with their answers to interrogatories submitted to them by defendants in preparation for trial. At trial Mr. Crews identified these documents as those signed by Mr. and Mrs. Clemente, and Mrs. Teaford testified that she saw them sign the note which called for a first interest payment March 15, 1968.

Plaintiffs thus acquired possession of the property in September, 1967; they have lived in the main house since October, 1967, and their tenant has occupied the tenant house. They have raised cattle continuously, introduced hogs to the farm, and used all equipment. In December, 1967, and February, 1968, they sold the cattle which were part of the August, 1967, transaction.

Mr. Clemente acknowledged that when plaintiffs took possession of the property, equipment, cattle, and fences were in good condition and the pastures were a "sea of grass." In addition, it was shown that the house and farm were in "very, very nice shape." The main house was "immaculate," "absolutely perfect in every detail." "The entire ranch was in immaculate condition." "It looked like a show place." As

[1]. These payments, together with the $20,650 down payment and $150 adjustment of June 2, 1967, total $196,500.

late as August, 1967, grass was "belly deep" on the cattle, and in August and September, 1967, was sufficiently abundant that plaintiffs tried to cut some of it for storage. At trial time, inspection revealed that the entire premises, buildings, fences, pastures, and equipment had been permitted by plaintiffs to deteriorate in condition.

Shortly after moving into the house in October, 1967, Mr. and Mrs. Clemente were given information by a neighbor, Norbert Gerling, that led them to believe there were approximately 200 acres of improved pasture on El Chico. They went to the Agricultural Stabilization and Conservation Service Office of the United States Department of Agriculture and viewed an aerial photograph of the ranch. At the request of Mr. and Mrs. Clemente, and under the ASCS office manager's direction, Mahlon Fisher, an ASCS employee, measured and platted the areas of improved pasture by ASCS standards. The clerk in the ASCS, by use of a planimeter, then computed the area of such improved pasture at 191.6 acres in 31 irregularly-shaped parcels. On a blown-up aerial photograph, improved, open, and partially open pasture areas were outlined and these totaled 204.92 acres. By an exercise of judgment, Mr. Fisher excluded from his designation of improved pasture 15.9 acres in bluegrass and 27.1 acres suitable for pasturing livestock.

Defendants did not claim at trial that the ranch contained 465 acres of improved pasture, but stated repeatedly the warnings given to Mr. and Mrs. Clemente to make their own acreage determination and reiterated their disclaimer of the 465-acre figure.

With respect to the cattle-carrying capacity of the ranch, Mr. Clemente judged, based on the ASCS-measured amount of improved pasture, that the ranch could not carry more than 67 cows (in a cow-calf operation) or fatten more than 70 mature cattle annually. Several cattle experts testified on the issue and their testimony is in some conflict.

Roy Gallemore, on behalf of plaintiffs, first visited El Chico in December, 1967, and later inspected it two or three times before testifying. His opinion was that 200 steers of 600 to 700 pounds could be grazed and 75 to 100 cows in a cow-calf operation could be maintained. Hillard Niebruegge, a former lessee of defendants in 1966, also for plaintiffs, gave his opinion that the ranch could not carry 400 head of mature cattle and fatten them during a single grazing season. He did not state how many could be supported; however, in 1966, he and his partner put 310 steers on El Chico in May, took them off in August when drouth struck, and put another 120 head on in October. William D. McCollum, for plaintiffs, did not think it possible to fatten 400 head of long yearlings weighing in excess of 800 pounds. " * * * you could probably have 150 to 200 head of steers per year if you had to graze them the six month period." In a cow-calf operation he felt 50 to 75 head could be handled.

Mr. Teaford acknowledged he had never had 400 head of cattle on the ranch at any one time, and that any such claim would be untrue. Ivo Frank, V. J. Plassmeyer, Robert Evans, and Jerry Botts, on behalf of defendants, were of the opinion that with proper management the ranch would support 200 cow-calf units or the equivalent of 400 steers. Also of value on this issue is Mr. Marion's advice to Mr. Clemente that the ranch would support 700 steers and the use of this figure by Mr. Schulman in his projection of profits for Mr. Clemente. During Mr. Clemente's prepurchase inspection of the ranch, there were 365 steers fattening, and 349 of them were included in the bill of sale in the transaction of August 29, 1967.

With respect to the amount of investment represented by the sellers, plaintiffs recite the testimony of Mr. Teaford on the elements of investment, $57,500 in real es-

tate, $54,000 in main house and other buildings, $15,000 in fencing, $49,000 in machinery and equipment, a total of $175,500. El Chico was advertised as having had more than the asking price, $250,000, invested in it. According to Mr. Teaford, this figure was obtained by capitalization of $175,000 with the balance paid out of the capital account to cover expenses of labor, fertilizer, seed, hand tools, and other expenses involved in such an operation. An entire sum of $270,000 in the ranch bank account went for the ranch and its improvements or for things used in and on the ranch.

These findings of fact, as well as those of the trial court, resolve all conflicts in the evidence in favor of defendants. In making such resolution, the trial court and this court have had not only the reasonableness of the total picture of this matter, as described by defendants' witnesses generally, and defendant John Teaford in particular, but have been aided also by the evidence of the reputation of both Mr. and Mrs. Teaford. Among such witnesses were two bankers, two lawyers, a stockbroker, and a merchant. All knew Mr. and Mrs. Teaford variously in social, business, and religious settings, and knew their reputation to be excellent for truth, veracity, and honesty, in contrast to Mr. Clemente's evaluation of Mr. Teaford as a "confidence man" and a "liar."

■ Appellants have not carried forward to this appeal their asserted false representations with respect to annual income, number of ponds, number of miles of fence, and condition of cattle. Their principal contention asserts that defendants made a representation with respect to the existence of 465 acres of pasture in the ranch, that it was false, that it was material and they were entitled to rely upon it, and that they were injured by it and entitled to rescission on that account. However, if the presence of all these elements be assumed, it does not require relief by

rescission to plaintiffs if, as found by the trial court and this court, defendants, through John K. Teaford, made an adequate disclaimer of the representation of the number of acres.

Recognizing this posture of the case, appellants contend that defendants' "claimed attempt to disavow these material misrepresentations * * * was insufficient as a matter of law to terminate plaintiffs' right to rely thereon." They argue that Mr. Teaford's statement to Mr. Clemente that he would not guarantee the exact acreage of pasture and that he should make his own determination of pasturage was not sufficient to give plaintiffs notice and imposed no duty on them to survey or investigate further.

It would be difficult for one to be more explicit than was Mr. Teaford in demonstrating his intention that Mr. and Mrs. Clemente could not rely on the 465-acre representation in the UFA brochure. At the outset of the first meeting with Mr. Clemente, he told Mr. Clemente that he could not guarantee the acreage of pasture. He did not stop with any simple recital but went on to explain how he arrived at the figure used by UFA in the brochure, i. e., that he used the same figures UFA had used when it sold him the three farms which comprised the present ranch sale. This was a frank disclaimer by Mr. Teaford of any personal knowledge with respect to acreage of pasture. At the most Mr. Teaford, in supplying material for the brochure, was saying he had information that the ranch had 465 acres in pasture and disclosed his source of information to Mr. Clemente. He made no assertion of its existence as a fact and therein lies a distinction between good and bad faith with respect to an erroneous representation. See 37 C.J.S. Fraud, § 21(d).

Mr. Teaford further advised that he had never measured the fields and that Mr. Clemente would have to make his own de-

termination. He previously had reserved this right with UFA with respect to any prospective purchaser it might bring as a result of the brochure's recital. Important also is the corroboration of Mr. Teaford by other witnesses. Also of value on this issue is Mr. Clemente's assertion of his superior knowledge of the farm following inspection by him and his advisors, and the purchaser's release of sellers from all liabilities when they advanced the closing of the purchase on August 29, 1967. Mrs. Clemente also was advised, and all of this transaction took place in the open with purchasers being fully advised by friends, accountant, and lawyer. Admittedly, all had free access for purposes of inspection of ranch, pasturage, fencing, cattle, equipment, houses and other improvements, and income statements. Plaintiffs thus went into this purchase fully advised and with their eyes open; only when the ranch failed to meet their unwarranted expectations did they look for some way to attempt to fault their sellers and seek to rue bargain. Plaintiffs would wish one to believe that the most important aspect of their purchase was 465 acres of pasturage, and yet when advised in most certain terms that such figure was not guaranteed, plaintiffs made no effort to protect themselves against a purchase of less acreage.

■ The evidence shows the disclaimer given by Mr. Teaford to plaintiffs to have been positive, direct, and to the point, even of disclosing the source of the questioned representation. As such, it was sufficient to meet appellants' complaint, because notice, in this connection, does not require positive information brought directly home to the party sought to be changed. "Anything which will put a prudent man upon inquiry is notice, and gross negligence in failing to make inquiry when the surrounding facts suggest the existence of others, and that inquiry to be made is tantamount in courts of equity to notice." Connecticut Mut. Life Ins. Co. v. Smith, 117 Mo. 261, 292, 22 S.W. 623, 629.

See also Hatcher v. Hall, Mo.App., 292 S.W.2d 619, 625–626.

Appellants assert that an identical attempted "qualification" of a representation as to quantity or quality of land was present in Boddy v. Henry, 126 Iowa 31, 101 N.W. 447, an action for damages for fraudulent misrepresentation that defendants' land contained 17,000 acres when in fact it contained about 15,300 acres. Defendants were successful in the trial court on their "qualification" that they would not guarantee the acreage; but, on appeal, the court dismissed such defense, holding that a refusal to guarantee the quantity of property is not inconsistent with liability for false representation. The distinction is that "defendant L. W. Conover, while insisting that he refused to guaranty the acreage of the land, admits that they told plaintiff there was about 17,000 acres, and says he then believed such to be the fact." 126 Iowa 34, 101 N.W. 1. c. 448. In contrast, Mr. Teaford not only stated that defendants could not guarantee the acres of pasture, he advised plaintiffs to measure them for their own satisfaction, and explained to them the source and quality of the 465-acre figure contained in the UFA brochure. Such is the distinction between a representation of fact and an announcement that the representation is based upon information and belief coupled with a positive disclosure of the source of the information. Hamlin v. Abell, 120 Mo. 188, 25 S.W. 516.

Similarly, in Jeffreys v. Weekly, 81 Or. 140, 158 P. 522, defendant's only effort to account for the disparity between improved acres as represented and the number actually in existence was by qualifying words "about" or "estimated." This, again, is in contrast to Mr. Teaford's disclaimer.

Appellants cite other cases bearing on the sufficiency of notice as a defense to representation, e. g., Cantley v. Plattner, 228 Mo.App. 411, 67 S.W.2d 125; Sautter v. Ney, 365 Mich. 360, 112 N.W.2d 509; Kelley v. Peeples, 192 Mo.App. 435, 182

S.W. 809; Shechter v. Brewer, Mo.App., 344 S.W.2d 784; Nixon v. Franklin, Mo., 289 S.W.2d 82; Wolf v. Kansas City Tire & Service Co., Mo.App., 257 S.W.2d 408; Judd v. Walker, 114 Mo.App. 128, 89 S.W. 558; Piazzini v. Jessup, 153 Cal.App.2d 58, 314 P.2d 196; Richard v. Baker, 141 Cal.App.2d 857, 297 P.2d 674; DeVoto v. Fez Construction Co., Mo.App., 271 S.W. 2d 199; Stones v. Richmond, 21 Mo.App. 17. There is no quarrel with the principles of law recognized in such cases, or with their application in those cases; however, all are subject to the same distinction made of Boddy v. Henry and Jeffreys v. Weekly, supra. None contained the disclaimer made by Mr. Teaford in this case.

Appellants argue alternatively that "even if Teaford's statements to Clemente on May 26, 1967, are deemed to constitute disclaimers of the misrepresentation of acreage, such disclaimers were negated and the misrepresentations of acreage were reinstated by subsequent repetitions of the misrepresentations by defendants and their agents." This contention is denied also on the strength of the facts found showing the effective disclaimer of Mr. Teaford. The assertion is weakened also by the release of liability contained in the August 29, 1967, Contract and Escrow Agreement by which this transaction was finally closed.

■ Appellants' next major contention asserts that defendants made representations that the ranch had capacity for 400 steers or their equivalent in a cow-calf operation, that they were false, that they were material, that plaintiffs were entitled to rely upon them, and that they were entitled to rescission on that account.

Appellants' argument emphasizes the brochure recital, "owner reports regularly fattening up to 400 head of mature cattle"; Mr. Teaford's admission that he had never had 400 head of cattle on the ranch at any one time; Mr. Clemente's testimony that Mr. Teaford said the ranch could handle 200 or possibly 300 cows in a cow-calf operation, and the testimony of plaintiffs' experts.

This approach, of course, discounts any effect of the language "up to" in the brochure. It also overlooks evidence that in 1966 a total of 430 mature cattle was fattened, 310 head beginning in May and 120 head beginning in September; that 365 head were fattened, an average of 160 pounds per head, between April and August in 1967. Also in August, 1967, there was sufficient grass in addition to that grazed, that Mr. Clemente wanted to make hay. Also overlooked in appellants' approach is the testimony of defendants' experts that the ranch would carry 200 cow-calf units or the equivalent of 400 steers; and forgotten is the advice of Mr. Marion to Mr. Clemente on the occasion of their May, 1967, inspection that the ranch would carry 700 steers. With the evidence in this condition, it may not be said that the trial court's denial of rescission to plaintiffs on this account was clearly erroneous.

Appellants cite Schuler v. Humphrey, 198 Or. 458, 257 P.2d 865, which is similar in that there was a representation by advertising that the ranch offered for sale could handle 50 cow-calf units or 400 ewes and lambs per year, when in fact only 165 ewe-lamb units could be handled, and rescission was granted. The case is distinguished by the absence of any substantial evidence to support the representation and in the showing by all the evidence that no more than 165 ewe-lamb units or 15 to 20 head of cattle could be supported. Also cited is Herschberger v. Woodrow-Parker Co., 6 Cir., 275 F. 908, in which denial of rescission was reversed on the representation by seller of a farm that it had "400 acres of good plow land" when in fact it had only 280 such acres. The decision was based on overreaching of a farmer with a third grade education accomplished by col-

lusion between the seller and the purchaser's advisor upon whom he relied.

■ Appellants' final contention asserts that defendants made representations that they had invested over $250,000 in the ranch, that they were false, that they were material, that plaintiffs were entitled to rely upon them, and that they were entitled to rescission on that account.

The evidence previously found on this issue shows that defendants had capitalized some $175,000 with respect to El Chico, and that the balance up to $270,000 was paid out of the capital account for labor, fertilizer, seed, hand tools, etc. Mr. Teaford's statement that all of the money was used in and on the ranch stands undisputed, and defendants' records and accounts were available to plaintiffs at all times and were examined by plaintiffs' accountant, Mr. Schulman, prior to their purchase of the ranch.

With the evidence in this posture, it may not be said that the trial court's denial of rescission to plaintiffs on this account was clearly erroneous.

Accordingly, the judgment is affirmed, and the cause is remanded for dissolution of the restraining orders and any other proceedings consistent with this decision.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., SEILER, J., and SMITH, Special Judge, concur.

BARDGETT, J., not sitting.